No. 17.—ELIAS S. WRIGHT, Administrator of Jemima Culpepper, deceased, plaintiff in error, *vs.* LEWIS F. HICKS, Administrator of David Culpepper, deceased, and Administrator, *de bonis non com testamento annexo* of David Culpepper, deceased, defendant in error.

[1.] The general report of the neighborhood, in questions of legitimacy, is not evidence in all cases. *Aliter,* as to reputation in the family.

[2.] The fact that the mother of a son, whose legitimacy is impugned by the father's relatives, permitted him to divide with her the estate of her deceased husband, although slight evidence, yet, is not to be entirely disregarded.

[3.] A bill in Equity, which merely recites the proof, from which the fact intended to be put in issue, may be inferred, is defective. It should positively affirm or deny the truth or falsehood of the matter in dispute.

[4.] Before the credit of a witness can be impeached, by proof that he has made statements out of Court, contrary to what he has testified to at the trial, it is necessary first to inquire of the witness himself, as to the time, place and person, involved in the supposed contradiction.

[5.] The doctrine as to *Adulterine Bastardy* in *Wright vs. Hicks,* (12 *Ga. R.* 155,) re-affirmed.

[6.] Although the birth of a child during wedlock raises the presumption that such child is legitimate, yet, this presumption may be rebutted, both by direct and presumptive evidence; and in arriving at a conclusion upon this subject, the Jury may not only take into their consideration, proof tending to show the physical impossibility of the child born in wedlock, being legitimate; but they may decide the question of the paternity by attending to the relative situation of the parties, their habits of life, *the evidence of conduct, and of declarations connected with conduct,* and to *any* induction which reason suggests, for determining upon the probabilities of the case.

[7.] Where the husband and wife have had the opportunity of sexual intercourse, a very strong presumption arises, that the child in question is the fruit; but it is only a very strong presumption, and no more. The presumption may be rebutted by evidence, and it is the duty of the Jury to weigh the evidence against the presumption, and to decide, as in the exercise of their judgment, either may appear to preponderate.

[8.] The old rule of these *quantum maxa,* as laid down by Lord *Coke,* was overruled in England, in 1732, the year Georgia was colonized, and consequently, it never obtained in this State.

[9.] When sexual intercourse is once proved, nothing short of *impossibility,* in such case, should impugn the legitimacy of the offspring. But where

sexual intercourse is presumed, merely from the propinquity of the parties, slighter proof is required to repel the presumption of paternity.

[10.] In questions of illegitimacy, in cases of ante-nuptial conception, slighter proof is required to rebut the presumption of legitimacy, arising from subsequent marriage, than in cases of past-nuptial conception.

[11.] Where there is evidence that neither the ostensible father, nor his family, recognized the child of his wife, begotten out of wedlock, as legitimate, but that he declared it to be a bastard, and treated it as such—that the child resembled the reputed father—that the husband and wife lived together five years without having other offspring—that after his death, she bore children to a second husband—that neither the wife herself, nor her friends, ever ascribed the paternity of the child to him, but to another man ; These are all circumstances to go to the Jury, from which they may infer the illegitimacy of the child.

In Equity, in Crawford Superior Court.   Tried before Judge Powers, September Term, 1853.

This bill was brought by Wright, as the administrator of Jemima Culpepper, against Hicks, as general administrator, and as administrator *de bonis non, cum testamento annexo,* of Daniel Culpepper, deceased.

The bill alleged that in February, 1849, Daniel Culpepper died, leaving a widow, Jemima Culpepper, surviving, and an estate worth $5000 ; and also left a will, as follows :

" *Item* 1st.   I give and bequeath unto my beloved wife, Jemima Culpepper, all my estate, both real and personal, during her natural life, after paying all my just debts, with the following reservations, to wit :

*Item* 2d.   I give and bequeath unto Berry Wesley Culpepper, (so called,) five dollars out of any money belonging to my estate.   The said Berry Wesley Culpepper, being the son of Elmira Culpepper, the wife of my only son, Isaiah Culpepper, deceased, and born in wedlock.

*Item* 3d.   Reserved $200 after the death of Mrs. Culpepper, to wall in the graves, erect head-stones, &c. of the family.

*Item* 4th.   Appointed Mrs. Culpepper executrix.

Mrs. Culpepper qualified under the will, and took the estate into possession. In 1849, she died, and Hicks took out letters of administration, generally, and letters of administration with the will annexed, on the estate of Daniel Culpepper; and the complainant applied for and obtained letters of administration, on the estate of Jemima Culpepper. Hicks took the estate into possession.

The bill further alleges, that Isaiah Culpepper, the son of Daniel and Jemima Culpepper, in 1836, intermarried with one Elmira Sullivan, and the said Elmira, in about three months after said marriage, was delivered of a son ; that on the next day after the marriage, the said Isaiah having discovered the imposition practised upon him—that is, the pregnancy of the said Elmira—returned her to her former home, and repudiated the said marriage, as far as he could do, protesting all the time against any knowledge, or even suspicion, of a want of chastity in the said Elmira.

The bill further alleged, that Isaiah Culpepper died before his father, Daniel Culpepper, and that Jemima Culpepper departed this life in 1847 ; that the said Berry Culpepper is now living ; that Daniel Culpepper and Jemima Culpepper, both died leaving no child or children, nor representative of child or children.

The bill prayed that Hicks, the administrator of Daniel Culpepper, might be decreed to deliver to the complainant, as the administrator of Jemima Culpepper, the entire amount of said property, for the reason that the same is the estate of the said Jemima, and not of the said Daniel Culpepper. Also, that the said Berry Wesley Culpepper might be decreed to be an illegitimate, and not entitled to any portion of said estate.

To this bill, a general demurrer was filed, which was sustained by Judge POWERS. To this decision exceptions were taken, and the case, by writ of error, carried to the Supreme Court, at Decatur, August Term, 1852.

The Supreme Court reversed the judgment of the Court below, re-instated the case, with leave to complainant's solicitors to amend their bill.

The amended bill " charged, that the said Berry Wesley Culpepper was not the offspring of Isaiah Culpepper, but a bastard ; that no sexual intercourse had been had by and between the said Isaiah and Elmira, before their marriage". The bill further charged, that Hicks had become the guardian of Berry Wesley Culpepper, and prayed that he might be made a party defendant to the bill.

To this bill, the defendant filed his answer, which it is unnecessary to set forth here.

On the trial of the cause, at September Term, 1853, counsel for complainant offered " to prove to whom, by the general reputation of the neighborhood, and in the family of Culpepper and his wife, the paternity of Berry Wesley was assigned".

The Court rejected the testimony, and counsel for complainant excepted.   Complainant then introduced John Perry, *who swore*, " that in a day or two after the marriage, Culpepper carried his wife back to her step-father's, Abel Daniel.   There was a likeness between Berry Wesley and Daniel's children— Daniel left the country soon after Culpepper's marriage.— There was a disturbance at that time in the family, on account of Mrs. Culpepper's pregnancy.   Culpepper told witness, a week or two after the marriage, he had returned his wife to her step-father, because he had been deceived, and found her pregnant by the said Abel Daniel ; Culpepper visited his wife for twelve months before the marriage ; had seen them in a room upon several occasions, when no one else was present".

Watson Sawyer sworn—" A day or two after the marriage, Culpepper told witness, that he had been entrapped in getting a wife—thought he was marrying a virgin, but upon going to bed with her, she appeared skittish, and would allow no familiarities ; after she fell asleep, by passing his hand over her, he discovered that she was pregnant—when he awoke her and upbraided her for the cheat she had put upon him, and asked who the person was that had debauched her, when she informed him that it was Abel Daniel, and he had carried her back to her step-father's".

Counsel for complainant offered divers other witnesses, whose testimony was much the same.

The defendant then read in evidence the testimony of Abel Daniel, taken by interrogatories, sued out by the complainant, (the complainant having declined to read them, and defendant adopting them as his own,) in which he denied having had intercourse with Elmira Sullivan. In them the following interrogatory was propounded: "Was it after or before the marriage, that you pointed out to Thomas Stripling and Turner Cates, the place where you had had intercourse with her, and thought you had got her with child"? To which he answered: "I might have said such things, but have never pointed out the place to them".

Thedoric Mentfort sworn. "I was present at the division of Isaiah Culpepper's estate, which was equally divided between Berry Wesley Culpepper and Lewis F. Hicks, who had married his mother; that both Hicks and his wife were anxious such should be the case"; to which testimony, counsel for complainant objected. The Court over-ruled the objection, and complainant excepted.

The defendant having closed, complainant offered to prove by Turner Cates, "that Abel Daniel had pointed out to him the place where he had got Elmira Sullivan with child, and to show, by him, what place it was," which testimony was rejected by the Court, and counsel for complainant excepted.

The case being closed, Washington Poe, Esq. of counsel for complainant, addressed the Jury, when the Court adjourned until eight o'clock next morning.

Upon the assembling of the Court next morning, the Judge announced "that he had examined the papers during the night; that the amendment to the bill was not such as the Supreme Court had directed; and that, under the state of the pleadings and evidence, he should instruct the Jury that there was no case before them on the pleadings and evidence, on which they could find Berry Wesley Culpepper illegitimate; that counsel might address the Jury, if they saw proper, but that the Court,

unless his mind was changed, would charge the Jury as intimated".

The Court then directed the Jury to sign a decree, vesting one-half of the property in complainant, as administrator of Jemima Culpepper. At this point, one of the Jury inquired "if they were not at liberty to retire and consider of the evidence"? The Court replied, that "he was responsible for the law, and that Berry Wesley, under the state of the pleadings and evidence, could not be decreed an illegitimate, and the Jury must obey instructions".

To which rulings of the Court, counsel for complainant excepted, and upon these several exceptions error has been assigned.

W. Poe, S. & R. P. Hall, and Green & Culverhouse, for plaintiff in error.

G. R. Hunter and Mounger, for defendant in error.

*By the Court.*—Lumpkin, J. delivering the opinion.

[1.] The first assignment is, that the Court erred in repelling the testimony offered by complainant, to prove to whom, by the general reputation of the neighborhood, and in the family of Culpepper, and his wife, the paternity of the boy, Berry Wesley Culpepper, was ascribed.

The two propositions embraced in this assignment should be separated. They stand on different grounds.

First, as to the *general* reputation in the vicinage. Questions involving public rights, such as prescriptions, commons, &c. may be proven by general reputation; but not so, where private rights are put in issue. Notwithstanding this general rule, there is not wanting respectable authority in favor of the admissibility of this species of evidence, in questions of illegitimacy. Without citing other cases, I need only to refer to the opinion of Chief Justice *Marshall*, in support of this doctrine, in *Stegall vs. Stegall*, (2 *Brockenbrough's R.* 256,) in

which he states, that this species of proof is not to be entirely over-looked or disregarded.   He intimates, however, that it is not in every case that resort should be had to it.   Upon the whole, we are inclined to think that, in the present case, the Court was right, perhaps, in rejecting so much of Mr. Perry's testimony as related to general rumor, respecting the parentage of Berry Wesly Culpepper.

But, does the reputation in the families of this boy's father and mother, as to his *status* or condition, stand upon the same footing ?  We think not, and upon the most obvious principle. This kind of proof is sufficient as to pedigree, and the title to property consequent thereon.   The relatives are properly supposed to be cognizant of such matters.   They are interested in having them rightly understood in protecting the good name and fame of the family from injurious reports.   And to this extent, the witness should have been examined.

[2.] The second assignment is, that the Court erred in admitting that portion of the testimony of Benjamin Sullivan objected to, and all and every part of the testimony of Theodoric W. Mentfort.

These witnesses proved that, upon the death of Isaiah Culpepper, the ostensible father of Berry Wesley, his estate was equally divided between his widow, and her son, without objection on her part.   Why should she object ?   Was he not her son, no matter by whom begotten.   What signified it to her, who was his father, so far as the division of the property of her deceased husband was concerned ?   Could it be expected that, in order to retain the whole of it, she should repudiate, as spurious, the fruit of her own womb ?   This testimony was very slight, and should have weighed but little with the Jury ; still, as it related to the conduct of the mother, it should have been received for what it is worth.

[3.] The third assignment of error is, in striking out the amendment to complainant's bill, because not made in accordance with the directions of the Supreme Court.

The defect in the original bill was, that it recited the proof merely, from which the bastardy of the boy might be inferred.

This Court directed it to be amended, so as to charge positive-ly, the illegitimacy of Berry Wesley Culpper; and that no ante-nuptial sexual intercourse had taken place between Isaiah Cul-pepper and his mother.    The bill is amended in strict conform-ity with the directions of this Court.

[4.] I shall, for the sake of convenience, consider the sev-enth assignment of error next.    Was the Court right in re-jecting the testimony of Turner Cates?    Its object was to dis-credit Abel Daniel.    He had been twice examined by commis-sion, at the instance of the complainant.    The two sets of in-terrogatories had been both executed, returned into Court and filed.    The complainant declining to use them, they were read by the defendant.    And the attempt was now made, to dis-credit Daniel, by showing, by Turner Cates, that he had made statements, out of Court, different from these which he had sworn to.    The objection to Cates' evidence was, that no suffi-cient foundation had been laid for it; that is to say, that Dan-iel, in neither of the two sets of interrogatories which had been taken out for him, had been asked to state whether, at a cer-tain time and place, and in the presence of certain individuals, naming them, he had not pointed out the place where the boy, Berry Wesley, had been begotten by him?    This preliminary inquiry was necessary, before Daniel could be impeached.— The questions propounded to Daniel, were as follows: "Did you not, a short time, or at any other time afterwards", (mean-ing after his step-daughter was brought back to his house by her husband,) "relate to divers persons, when the thing was fresh in your mind, what took place in the field?    State to whom, and what you said to them"?    To this, the witness, Daniel, answered, "I said many things to vex the opposite party, which I now don't recollect".

It will be perceived, that the defect in this interrogatory is, that it refers to no place where the conversation was alleged to have taken place; neither does it name the persons who were present and heard it.

The same interrogatory is renewed in these words: "was it after or before her marrirge, that you pointed out to Thom-

as Stripling and *Turner Cates*, the place where you had intercourse with Elmira Sullivan, your step-daughter, and thought you had got her with child? State particularly, the time when this intercourse took place"? He answered, "in wrath, I might have said such things; but never pointed out the place to them".

Here, neither the time nor the place are specified, when and where the alleged conversation took place, although the individuals are mentioned with whom it was held—Turner Cates, the witness by whom it is proposed to impeach Daniel, being one of them.

We think that, according to the rule established in the *Queen's Case*, (2 *Brod. & Bing.* 313, 314); and recognized first, by this Court, in *Sealy vs. The State*, (1 *Kelly*, 213,) and many subsequent decisions, that the testimony of Turner Cates was properly rejected—no sufficient foundation having been laid for it—according to the authority of these cases, and now pretty generally adopted in this country. (1 *Greenl. Ev.* 516, *notes.*)

[5.] I propose to consider the 4th, 5th and 6th assignments together.

The testimony in the case having closed, and the opening counsel for the complainant having addressed the Jury, night intervened, and the Court adjourned until next morning. Upon re-assembling, his Honor, the presiding Judge, announced to complainant's Solicitor, that he had examined the pleadings and proof, and was satisfied that no recovery could be had against the rights of Berry Wesley Culpepper; and accordingly dictated a decree to the Jury, denying to them, upon their own solicitation, through their foreman, the privilege of retiring to consult, and make up their own verdict.

If the Court was right in supposing that the Law, as applicable to the facts proven, would not justify the Jury in bastardizing Berry Wesley Culpepper, then the direction he gave to this case can be sustained, but not otherwise.

[6.] When this case was before this Court, at its August Term, at Decatur, 1852, it was ably and thoroughly discussed.

The importance, as well as the novelty of the question, led us to devote to it as large a portion of our time as we could possibly spare, from other necessary avocations. We exerted our utmost diligence to collect all the information, so as to enable us to form a correct judgment, and prescribe the best possible rule that our minds were capable of arriving at. And we flatter ourselves, that we did not toil in vain. And the principles of law regulating this question, as deducible from all the authorities, English and American, were thus summed up: that is, that although the birth of a child, during wedlock, raises a presumption that such child is legitimate, yet that this presumption may be rebutted, both by direct and presumptive evidence. And that, in arriving at a conclusion upon this subject, the Jury may not only take into their consideration proofs tending to show the physical impossibility of the child born in wedlock being legitimate, but they may decide the question of paternity, by attending to the relative situation of the parties— their habits of life, *the evidence of conduct, and of declarations connected with conduct,* and to *any* induction which reason suggests, for determining upon the probabilities of the case.

[7.] That where the husband and wife have had the opportunity of sexual intercourse, a very strong presumption arises, that it must have taken place, and that the child in question is the fruit; but it is only a very strong presumption, and no more. The presumption may be rebuted by evidence; and it is the duty of the Jury to weigh the evidence against the presumption, and to decide, as in the exercise of their judgment, either may appear to preponderate. *Wright vs. Hicks,* (12 *Ga. Rep.* 155.)

We now re-affirm, distinctly and fully, the doctrine then laid down, as the Law of this case. Indeed, it is the Law, not now questioned in any respectable quarter, on this or the other side of the water, whatever doubts may have once been entertained to the contrary. It has been the Law of Westminster Hall, since the decision of *Prudsell vs. Prudsell,* (2 *Strange* 925,) in 1732, by Lord *Raymond.*

[8.] The unreasonable doctrine of being without the four seas, or proving impotency, was then overruled; and the Jury were instructed that they were at liberty to consider the point of access, which they did, and found against the plaintiff, although begotten and born within wedlock, and his mother and father both living in England, at the time—the one in *London* and the other in *Staffordshire*—and there was some proof that the husband had been in London within the last year before the child was born.

This adjudication was co-eval with the colonization of this State. Georgia, therefore, never was enthralled by the old rule, laid down by Lord *Coke.*

In the decision of the *Banbury Peerage Case,* Lord *Erskine* was the only Law Lord, who held that the presumption of legitimacy arising from marriage, could only be rebutted by proving the *impossibility* of sexual intercourse. For forensic eloquence, Lord *Erskine* stood unrivalled in his day, at the British Bar. But he did not certainly add to his reputation as a Jurist, by going on the Woolsack. Legal history is fruitful in examples, that great lawyers do not always make great Judges, and *vice versa.*

When Mr. Justice *Wayne* cites, therefore, the *Banbury Peerage Case,* as authority for the *dictum,* in *Mrs. Gaines' Case,* in 6 *Howard,* 589, I respectfully submit that neither the decision itself, nor the opinions of Lords *Eldon, Redesdale* and *Ellenborough,* sanctioned the idea, that when marriage is once proved, nothing shall be allowed to impugn the legitimacy of the issue, short of the proof of facts showing it to be impossible that the husband could be the father.

[9.] If he had said, that when *sexual intercourse,* instead of *marriage,* is once proved, that nothing short of *impossibility,* in such case, shall impugn the legitimacy, the Law would have been correctly stated. For, unless an impossibility is shown, neither father nor mother can tell who begat the child. But where sexual intercourse is merely *presumed,* from the propinquity of the parties, a very different rule obtains; and it requires much slighter proof to rebut the presumption of pa-

ternity.    And some Courts have overlooked this most obvious distinction.

The last case connected with this subject, is that of *Morris against Davis*, (*Sir Harris Nicolas on Adulterine Bastardy*, 216.)    It is one of considerable importance, and has attracted, perhaps, more of public attention than any other, except the *Banbury Peerage*, in consequence of the number of times it was tried, and the length of time it was pending—about eighteen years.    It was finally decided by Lord *Lyndhurst*.    This case re-affirms, *in toto*, the doctrine maintained in the *Banbury Peerage Case*, namely: that the Law will presume legitimacy, unless the contrary is proved; and that, to repel this presumption of Law, light circumstances will not be sufficient; but that the evidence must be clear and satisfactory, to the minds of those who are to decide upon the question.

[10.]    I venture to suggest another observation.    While the Law presumes every child legitimate which is born within wedlock, still, in questions of this sort, there is and should be a difference between past and ante-nuptial conceptions.    In the latter, much slighter proof should be required to repel the presumption of legitimacy, arising from marriage.    For here, it is the marriage only, and not the presumed sexual intercourse, resulting from marriage, which creates the presumption.    Every child begotten and born within wedlock, is rightly presumed to be the offspring of the husband.    But such presumption does not necessarily arise, where the child is begotten *before* marriage.    Another man may as likely be the father, as the future husband, as no one was entitled to sexual intercourse.

[11.]    Such, then, being the Law, was there any evidence in the record, to require the case to be submitted to the Jury?

I will not attempt to sum up the whole of the proof, but refer to a few particulars only.

It was in evidence, that Isaiah Culpepper took his wife home to her step-father's, the morning after they were married; that his friends found him in the most disconsolate condition, when they called at his house.    In answer to their inquiries, he stated that he had no wife; that he had carried the woman

that he had married, back to Abel Daniel's, her step-father's, because she was big; that upon undertaking to fondle her, after he retired to bed, she appeared very shy, and would not allow him any of the liberties of a husband; that after she fell asleep, he passed his hand over her person, and felt a child stir; that he awoke her, and upbraided her with the cheat she had put upon him, as he took her, supposing her to have been a virgin. He inquired who the person was, that had debauched her; when she informed him that it was Abel Daniel. He vowed to his friends, that he always had believed her to be a virtuous girl. She remained away until the child was born, which was within less than three months after the marriage. He was then prevailed on, by their mutual friends, to take her back, in consideration that she had been made the victim of an artful and most heartless seducer, who took advantage of his situation, to effect her ruin. The child was left behind.

It was in proof, that the child resembled some of Daniel's children strongly, and Daniel himself. And this circumstance, by the way, was relied upon, amongst others, in the case of *Morris and Davis*. It was in evidence, that this affair created a great deal of disturbance in Daniel's family; that he himself left the country shortly thereafter, and did not return until after the death of his wife, the mother of Mrs. Isaiah Culpepper, by a former husband.

Were Isaiah Culpepper and his wife in life, then, their declarations would not be admissible in evidence, to bastardize the issue. But being dead, they are competent testimony; and especially as connected with the conduct of the parents, and explanatory thereof.

In the case of *Morris and Davis*, as in this case, the question arose, whether the inference arising from the conduct of the parties, may be held sufficient to rebut the legal presumption springing out of the marriage. And the Court there thought, that the evidence arising from the conduct of the parties, was most material and important; and suggested what is true, that in the *Banbury Peerage Case*, the conduct of the parties—not at the time of the *conception* of the child—but at

its birth, and for several years subsequently, and the evidence thus arising, formed a principal ground of the judgment of the House of Lords.

Now, the Jurors in this case, as parents, and as practical men, well versed in human nature, and the ways of the world, would naturally ask themselves, was the conduct of Isaiah Culpepper and his wife, reconcilable with the supposition that he was the father of this child? Why this coyness on her part? She might, from prudential motives, have concealed from her lover, her situation before marriage, lest he should break off the courtship. But why dread to reveal to him her true condition now, if he were the father? Should he venture to reproach her, could she not reply, am I to blame? I did but yield to your importunity, and allow you to anticipate the fruits of wedlock. Would not his mouth be stopped? But why this reserve in the nuptial couch, when the privileges claimed, were only the continuation of an indulgence already allowed? The wife's conduct cannot be explained upon this supposition. No, she knew and felt, poor thing, that her sweet-heart and husband had been made the unsuspecting dupe of a most cruel fraud; that the hour had arrived when concealment was no longer possible. The miseries of a future life, be it long or short, were crowded in that moment. She postpones the revelation as long as possible. Who, that has a heart of flesh, does not pity her mental agony! But the disappointed husband detects her condition, and upbraids her with it. Concealment was no longer possible—she ingenuously confesses the fact; and states that Abel Daniel, her step-father, was the author of her undoing.

Let us turn, now, to the conduct of the husband. He says to his sympathizing friends, to whom he was unbosoming his sorrows, in his own simple, but expressive words, laying his hand upon his heart, "when I felt the child stir within her, my joy was killed". Next morning he returns his wife to her own home. What outrageous and unparalleled impudence, upon the hypothesis that he was the father of the child! Would he—could he—have treated this woman, to whom he seems to have

Wright, adm'r, *vs.* Hicks, adm'r.

been devotedly—not to say blindly—attached, so unjustly, if this was the result of his own folly and crime? Could he have faced her deeply injured mother—her foully slandered step-father, with this deed resting on his own conscience? It is impossible. And then, to compel the mother to separate from her sucking-child—a babe of five weeks old, and that infant his own—to be nursed and nourished by others!

But what is the conduct of Mr. and Mrs. Daniel, the other *dramatis personæ* in this tragedy? When the step-father was informed by Culpepper that he had brought his wife back, and he desired him to face her, he looked crest-fallen—or to use the more expressive figure of Culpepper, "like he could creep through an augur hole". He immediately quits the country and remains away until the tongue of his much-wronged wife is silenced in death, and her grief-stricken looks can reproach him no more.

But was the heart-broken mother and wife ever heard to utter aught against Isaiah Culpepper? No witness has testified to it. She felt, no doubt, that like herself and her too-confiding child, he was a much-wronged man. And instead of arraigning him for his injustice, she sympathized with him in his great affliction. The Jury might advert to the opinion in the family, as to the paternity of this boy. Look at the will of old Mr. Culpepper, how guardedly written? He gives and bequeathes "to Berry Wesley Culpepper, (so called?) *five dollars*—the said Berry Wesley Culpepper being the son of *Elmira Culpepper*, the wife of my only son, Isaiah Culpepper, deceased, and born in wedlock"! He leaves to the only child of *his* only child, the sole descendant of his loins, five dollars, only, out of his estate! Can anybody doubt the grand-father's opinion, as to the spuriousness of this boy's blood? And shall the law of the land, and all the rules of evidence be disregarded, to make this supposititious heir the sole inheritor of the grand-parent's property?

The medical opinion of Dr. Harvey need not be controverted. The fact is, nevertheless, undeniable, that the wife conceived by some man before her inter-marriage with Isaiah Culpep-

per—she lived with him five years afterwards, and never had another child. He died—she married again and gave birth to other offspring. True, these facts may not be absolutely inconsistent with the conclusion, that the husband was endowed with generating potency. It is a circumstance, however, from which, in connection with others, the Jury might infer the contrary.

We concede that this boy has the right to stand upon his legal rights—his heirship to the family inheritance arising from the presumption of marriage, whatever may be the actual facts of the case. And these rights should be respected by the Court. Still, we do not feel the hardship, as it is claimed to be in the argument, of depriving him of what is called his birth-right. He has received, without objection, his half of Isaiah Culpepper's estate. If he be not bone of his bone, and flesh of his flesh, is not this enough? And are the collateral relations of old Daniel Culpepper and his wife, to be taunted for endeavoring to prevent this wild olive branch, as they consider him, and as old Daniel Culpepper, himself, esteemed him, from being grafted on the family stock?

Thus, the Jury may have reasoned upon the facts of this case; and I have said enough, I trust, to make it manifest that it should have been left to them; and that the Court below erred in withdrawing it entirely from their consideration, and dictating from the Bench the decree which they should render. With the Law of the case given them in charge, as heretofore expounded by this Court, and now repeated, it was a matter *exclusively* for their determination.