## BAKER *v.* BAKER.

| | |
|---|---|
| 13 | 87 |
| 90 | 454 |
| 13 | 87 |
| 110 | 422 |
| 13 | 87 |
| 120 | 186 |

THE 8th section of the Act of 1851, concerning divorces, which provides, that "no divorce shall be granted in any action by default of the defendant, nor on the admission or statement of either party," does not prohibit the introduction of confessions in evidence, but simply prevents granting a decree on them alone.

This was the rule of the common and English Ecclesiastical law, and our statute is merely affirmatory of that rule.

The object of the rule requiring proof, in corroboration of defendant's confessions, is to guard against collusion; and when the entire testimony, confessions, and circumstances, repel all suspicion of collusion, and leave no doubt of the truth of the confessions, the Court should act upon them.

Where a statute is in affirmance of the common law, it is to be construed as was the rule by that law.

In a verified answer an evasion of the controlling fact in issue, is a strong circumstance against the defendant.

A child born in lawful wedlock, is presumed to be the child of the husband. The marriage is an acknowledgment by the husband that the child is his; but, to be effective, there must be knowledge at the time of the fact admitted. Hence, where a man marries a woman with child, the law presumes the child is his; but

this presumption is based upon the assumed fact that he knew, at the time of his marriage, the situation of the woman.

Marriage by our law is a civil contract, and may be avoided for material and substantive fraud in its procurement; and ante-nuptial pregnancy by a stranger is a fraud going to the very substance of the contract, vitiates it *ab initio*, and authorizes a divorce.

A woman to be marriageable must, at the time, be able to bear children to her husband; and a representation to this effect is implied in the very nature of the contract.

APPEAL from the Twelfth District.

Action for divorce *a vinculo matrimonii*, on the ground of fraud. The facts appear in the opinion of the Court.

*McDougall & Sharp*, for Appellant.

I.   The confessions of the defendant were admissible.

Section 8 of the Act of 1851, as to proof in cases of divorce, is simply in affirmance of the common law, and must be construed according to that law. (*Harlest's Case*, 3 Coke, 13; 2 Vol. 13; *Stowell* v. *Lord Zouch*, 1 Plowd. 364, *a; Moore* v. *Hussey*, Hobart, 97; Bacon Abr. Statutes, I. 4, Vol. 9, 245; 1 P. Wm. 252; 2 Just. 148, 301; 1 Saund. 240; 10 Mod. 245; Foster, 94; 11 Mod. 150; Bacon Stat. I. 5, 246; Plowd. 205; *Stradling* v. *Morgan*, Lit. R. 212; 11 Mod. 161; 1 How. 491; 1 John. 105; *Burgess* v. *Burgess*, 4 Eng. Eccl. 532, 546.)

The reason for excluding confessions in cases of divorce, is the danger of collusion. This reason cannot apply when it affirmatively appears there can be no collusion. (Smith's Com. 637; Bishop on Divorce, Secs. 305, 309, 310. *Billings* v. *Billings*, 11 Pick. 461; *Matchen* v. *Matchen*, 6 Barr, 337; *Sawyer* v. *Sawyer*, Walker's Ch. R. 52; *Tewksberry* v. *Tewksberry*, 4 How. Miss. 111; *Conant* v. *Conant*, 10 Cal. 254.)

II.   The fact that the child was begotten by a stranger is sufficiently established.

The defendant confesses the fact clearly and distinctly, and in addition to the confessions, we have the following circumstances:

1. The child was generated out of wedlock, and *before the contract of marriage* between plaintiff and defendant.

2. The child has a putative father other than plaintiff.

3. The putative father was on terms of intimacy with defendant at and during the time when the child should have been generated.

Baker *v.* Baker.

4. The defendant, and the family of defendant, have recognized, or at least acquiesced in the fact, that the child was the offspring of the putative father.

5. The defendant, under circumstances which do not admit of the idea of collusion, admits the child the offspring of the putative father.

6. The plaintiff and defendant lived together from the time of the contract of marriage, until the time the obnoxious fact presented itself, in harmony. Immediately upon its presentation, upon the first notice of the wrong, plaintiff did all in his power, or in the power of any man, to vindicate himself—to discharge himself from the burden of a child foreign to his blood, and the burden of a wife false to her obligations. He repudiated child and wife.

7. The plaintiff not only repudiated, but separated from the defendant immediately upon notice of the fact.

8. The repudiation and separation were recognized as for good cause, both by the defendant and her family.

9. The answer of defendant, which is not a mere " admission or statement," but which, from its being under oath, has the dignity of evidence, is itself a fact. While, under our statute and the general rule of law, it could not by itself justify a conclusion, it has the character and force of a most significant circumstance. It is itself a confession distinct and independent in such a form, and made under such circumstances, as not only repels all idea of collusion, but all foundation for the suggestion that the first confession was made under questionable circumstances; and if the doctrine in *Vance* v. *Vance,* (8 Greenleaf, 132,) is recognized as sound, would by itself justify a decree against defendant.

The force of these circumstances is sought to be overcome by the legal presumption that a child born in lawful wedlock is the child of the husband. We admit this presumption in its place, but deny its applicability to the present case. The rule is derived from the English law, but not from that law as applicable to divorces. The effect of ante-nuptial incontinence has been a frequent subject of discussion in the English Ecclesiastical Courts, but the effect of, or the presumption incident to, ante-nuptial pregnancy, seems open to be settled according to the rules of

Baker *v.* Baker.

right reason. (For the English rule, as recognized by American authorities, see 1 Black. Com. 457.) The presumption at most is the legitimacy of the child. (See, also, *Wells* v. *Stout,* 9 Cal. 499 ; Mathews Presumptive Evidence, 24, 25.) The question in *Stetgall* v. *Stetgall,* (2 Brock, 265,) cited by defense, was one of legitimacy. As to the authorities cited to show the inadmissibility of defendant's confessions. The cases of *Baxter* v. *Baxter,* (1 Mass. 346,) and *Holland* v. *Holland,* (2 Id. 154,)[*] are perfectly consistent with the ruling in *Billings* v. *Billings,* (11 Pick. 461,) and *Vance* v. *Vance,* (8 Greenleaf,) and clearly sustains the same doctrine. The same is true of *Betts* v. *Betts,* (1 John. Ch. 197); *Van Veghten* v. *Van Veghten,* (4 John. Ch. 501); and *Barry* v. *Barry,* (Hopkins Ch. 118.) Every one of the cases cited recognizes the admissibility of the confessions and their sufficiency when supported by circumstances which repel all idea of collusion.

The defendant having been with child by a stranger at the time of the contract of marriage, and having concealed her condition from the plaintiff, was such concealment a fraud, and may the plaintiff for this cause have the contract canceled ? (Comp. Laws, 371.) Divorce may be granted " when the consent of either party was obtained by force or fraud, upon the application of either party."

Our statute intends to place the marriage contract upon the same grounds with other civil contracts, and to justify its avoidance for material fraud in the making or procurement of the contract. (Reeves' Domestic Relations ; Irving's Civ. Law, 102 ; 2d Burns' Eccl. Law, 500*a; * Page on Divorce, 161, 162 ; *Morris* v. *Morris,* Wright's Rep. 630 ; *Ritter* v. *Ritter,* 5 Black. 81 ; *Scott* v. *Shufeldt,* 5 Paige, 43 ; *Montgomery* v. *Montgomery,* 3 Barb. Ch. 132.)

*Stanly & Hayes,* for Respondent.

1. The testimony as to the so-called confessions of the defendant was inadmissible, as they could not be the basis of a divorce.

The rule of the common law never prevailed in this State, for Section 8 of the Act concerning divorces, passed in 1851, (see Comp. Laws, 372,) which section was re-enacted in 1857,

(see Laws of 1857, 240,) provides that, "No divorce shall be granted in any action by the default of the defendant, nor on the admission or statement of either party, but in all cases the Court shall require proof of the facts alleged, as the grounds for a divorce." (*Conant* v. *Conant*, 10 Cal. 254; 2 Kent, 67; *Hansley* v. *Hansley*, 10 Ired. 510; *Hansel* v. *Hansel*, Wright's Ohio, 212; *Brainard* v. *Brainard*, Id. 354.)

The authorities cited by the counsel for the plaintiff on the subject of confessions, come from States and countries where the common law rule prevails, and they all, with one exception, reject confessions unless corroborated. (*Baxter* v. *Baxter*, 1 Mass. 346; *Betts* v. *Betts*, 1 John's Ch. Rep. 198; *Doe* v. *Roe*, 1 Johns. Cases, 25; *Holland* v. *Holland*, 2 Mass. 153; *Washburn* v. *Washburn*, 5 N. Hamp. 195; *Clutch* v. *Clutch*, Saxton's, N. J. 474; *Devenbagh* v. *Devenbagh*, 5 Paige's Ch. 555; *Matchin* v. *Matchin*, 6 Barr, Penn. 337; *Montgomery* v. *Montgomery*, 3 Barb. Ch. 134; *Hansel* v. *Hansel*, Wright's Ohio, 212; *Brainard* v. *Brainard*, Wright's Ohio, 354; *Miller* v. *Miller*, 1 Green's Ch. N. J. 143.)

2. The "admission or statement" of the defendant, is not a confession in law; or, in other words, it was made under such circumstances as not to entitle it to any credit.

A statement, to constitute a confession, must be made voluntarily. (1 Greenleaf's Ev. Secs. 219, 229, p. 208, Note 1; 1 Greens. Ch. R. 139; Bouvier's Law Dict. word "Confession.") Here the confessions were not voluntary.

3. The testimony, even if the confessions were admissible and competent, does not establish that the defendant was pregnant *by a stranger*, at the time of her intermarriage with the plaintiff.

The *only* evidence offered by the plaintiff to establish that she was pregnant by a stranger, was an admission made through fear.

The law presumes that the child born of the defendant, after her marriage, was the offspring of the plaintiff. *Moss* v. *Moss*, 2 Ired. 60; *Stegall et al.* v. *Stegall*, 2 Brock. 261.)

The record shows that he acquiesced in the child being his for several days after its birth, that he did not attempt to repudiate it until Wm. Arrington called on him at the Oriental Hotel.

In *The State* v. *Herman*, (13 Ired. 502,) it was held that a "child born in wedlock, though born within a month or a day

after marriage, is legitimate, by presumption of law." (See, also, the authorities cited in Notes 1 and 2, 2 Greenl. Ev. Sec. 150; *Scroggins* v. *Scroggins*, 3 Dev. 535, 547; *The King* v. *Luffe*, 8 East. 191.)

In this case, it is shown that the plaintiff's courtship extended over a period of some seven or eight months previous to the marriage; that they had been engaged for that length of time before marriage; that he was frequently with her alone, while she was not alone with any other person than himself; that they lived happily together until two or three days after the birth of the child.

In *Montgomery* v. *Montgomery*, (3 Barb. Ch. 135,) which was an action to obtain a divorce, the Court said, "in the absence of any proof to the contrary, the legal presumption is, that the child, of which the defendant was subsequently delivered, was the child of the complainant, although the testimony shows it must have been begotten before the marriage." (See *Baxter* v. *Baxter*, 1 Mass. 346; *Holland* v. *Holland*, 2 Mass. 154.)

4. If the defendant was with child by a stranger, at the time of her intermarriage with the plaintiff, the mere failure to disclose that fact, there being "no false representations," nor "active measures to deceive," was not a fraud, within the meaning of our statute concerning divorces. Nor would it be a ground of divorce at common law. (Bishop on Divorce, Sec. 106; *Baden* v. *Baden*, 3 Dev. 548.)

"If a woman pretends to be a virgin, while she is not, or even while she is a common prostitute, a marriage contracted on the faith of the representation is nevertheless good." (Bishop, Sec. 105.)

This is the settled law of Scotland, and is also the doctrine of the English Courts. (Note 1, to Sec. 105, Id. and cases there cited, Sec. 101, *et seq.*) As to meaning of "fraudulent contract," as applied to Marriage and Divorce, see *Benton* v. *Benton*, (1 Day, 111.)

FIELD, J. delivered the opinion of the Court—BALDWIN, J. concurring.

On the 22d of September, 1857, the parties to this action intermarried, and until the tenth of the following February they lived

Baker *v.* Baker.

together as husband and wife. On this last day, four months and nineteen days from the date of the marriage, the defendant gave birth to a fully developed child. The plaintiff insists that this child was begotten by a stranger; that the defendant knew, or had sufficient reason to believe that she was with child at the date of her marriage, and concealed the fact from him; that he was ignorant of her condition, and believed her at the time to be chaste and virtuous; that he continued thus ignorant until the birth of the child, and that upon this event happening, he repudiated the defendant and her child, and so soon as her health would permit, returned her with the child to her family and relatives. Upon these facts, as established, the plaintiff seeks a divorce *a vinculo matrimonii*, on the ground of fraud. On the hearing before the Referee, the confessions of the defendant as to the father of the child were admitted in evidence, against the objection of her counsel; and much of the argument at the bar was directed to the propriety of their admission. In considering the case, three questions present themselves for determination. These relate: 1st. To the admissibility of the testimony as to the confessions. 2d. To the sufficiency of the testimony if admitted, taken in connection with corroborating circumstances, to establish the fact alleged that the child was begotten by a stranger; and, 3d. To the sufficiency of the cause assigned, if established, viz: the condition of the defendant at the date of her marriage and her concealment thereof, the plaintiff being innocent and ignorant, for a divorce under our statute.

The objection of the defendant's counsel to the introduction of the confessions rests chiefly upon the eighth section of the Act of 1851 concerning divorces, which provides that "no divorce shall be granted in any action by default of the defendant, nor on the admission or statement of either party; but in all cases the Court shall require proof of the facts alleged as the grounds for a divorce. A similar provision, in identical language, is contained in the Supplemental Act of April, 1857. The statute, as appears, does not in terms prohibit the introduction of confessions; but only provides that the decree shall not be granted on them. In this respect it is only affirmatory of the well established rule of the common and of the English Ecclesiastical law, which has been recognized from the earliest period,

both in England and the several States of the Union. The object of the rule is to prevent collusion between the parties. Without some limitation of this kind it would be in the power of the parties to obtain a divorce in all cases. The public is interested in the marriage relation and the maintenance of its integrity, as it is the foundation of the social system, and the law wisely requires proof of the facts alleged as the ground for its dissolution.

The agreement of the parties will not answer, as then the marriage relation would be one only of temporary convenience; the default in the action will not answer, as this would only be another form for carrying out their previous agreement; confessions alone will not answer, because they may be the result of collusion, and be untrue, in fact. But the public can have no interest in suppressing the truth; and, as a means of its ascertainment, the confessions of parties against their interests have always been regarded as evidence of the most important character. And when all presumptions of collusion are repelled, and, from circumstances, it appears reasonably certain that the confession made is true, the ground of the rule of exclusion in cases of divorce is obviated, and there can be no reason for refusing consideration to the confession. "Thus, it has been held," observes Dr. Lushington, in *Harris* v. *Harris*, (2 Hagg. Ecc. R. 409,) "that confession, when perfectly free from all taint of collusion, when confirmed by circumstances and conduct * * ranks among the highest species of evidence. It has been so held on different occasions. It was most truly stated by Lord Stowell in the case of *Mortimer* v. *Mortimer*, 'that the Court was inclined to view confession, when not affected by collusion, as evidence of the greatest importance,' and the grounds upon which the Court laid down this principle are too obvious to need any explanation."

In *Matchin* v. *Matchin*, (6 Barr, 337,) Gibson, C. J. said: "It is a rule of policy, however, not to found a sentence of divorce on confession alone; yet, where it is full, confidential, reluctant, free from suspicion of collusion, and corroborated by circumstances, is is ranked with the safest proofs."

In *Sawyer* v. *Sawyer*, (Walker Ch. 52,) Manning, Chancellor, said: "In cases of adultery, the right to a divorce consists in the

proof of a single fact; and if the confessions of the party were to be received as sufficient proof, there would be danger of collusion. It is to guard against this that other proof is required in corroboration of the defendant's confessions. The same rule must apply to confessions as evidence in all other cases of divorce from the bonds of matrimony, with this limitation: that, where there is less danger of collusion, or it could not be practiced so easily, the corroborating facts or circumstances need not be of so decisive a character. The object of the rule is to guard against collusion—not to obstruct the administration of justice. Where the circumstances of the case are such as to repel all suspicion of collusion, and leave in the mind of the Court no doubt of the truth of the confessions, it should act accordingly."

The rule of the statute, as we have already observed, is that of the common, as well as of the ecclesiastical, law. That no decree or sentence can be founded upon the sole evidence of the confessions of the defendant out of Court, "is clearly," says Bishop, (Sec. 305,) "the rule of the ancient, as well as the modern common law. For, in Collet's case, it being suggested to the Court of King's Bench that parties who had lived together sixteen years, were proceeding in the Spiritual Court collusively, on the false allegation of incest, to dissolve a marriage for the purpose of bastardizing their children—'they both appear and confess the matter, upon which a sentence of divorce was to pass'—it was held that prohibition would lie."

The statute of this State, being in affirmance of the common law, is to be construed as was the rule by that law. This is a received doctrine of construction in such cases. Thus in *Miles* v. *Williams*, (1 Peere Wms. 252,) the Court said: "The best rule of construing Acts of Parliament is by the common law, and by the course which that observed in like cases of its own before the Act;" and, in *Arthur* v. *Bokenham*, (11 Mod. 150,) the Common Pleas said: "The general rule in exposition of all Acts of Parliament is this—that, in all doubtful matters, and where the expression is in general terms, they are to receive such a construction as may be agreeable to the rules of the common law, in cases of that nature; for statutes are not presumed to make any alteration in the common law, further or otherwise than the Act does expressly declare; therefore, in all general

matters, the law presumes the Act did not intend to make any alteration; for, if the Parliament had had that design, they would have expressed it in the Act." (See Bacon's Abridg. 9 Vol. 244, Rules to be observed in the construction of a Statute, 4; and Viner's Abridg. 19 Vol. 512, Construction of Statutes, 12, and authorities there cited.)

Having in view, then, the doctrine of the law as it existed previous to the adoption of the statute, and the reason of it, and regarding the statute as merely declaratory of that doctrine, we are necessarily led to the conclusion that it was never intended to exclude entirely the introduction of confessions, but only, as the statute in terms purports, that upon them the decree shall not be granted; and that to them, when freed from the presumptions of collusion, and sustained by circumstances, the Court may justly look as evidence of greater or less weight, according to the special character of the case. The question, as justly stated by the counsel for the Appellant, is this : " Would the entire testimony, confessions, and circumstances, lead the guarded discretion of a reasonable and just man to the conclusion."

The circumstances under which the confession was made by the defendant exclude all presumptions of collusion. It was made with reluctance—under great distress of mind, from sense of shame, and the humiliation of her position—to her own brother—and fully exonerates the plaintiff, and names the seducer of her virtue, and the time and place of her seduction. Previous to this the plaintiff had, on repeated occasions, informed the brother, that he should return the defendant to his house, and it would appear that some words of anger had passed between them on the subject; the brother attributing, at first, to the plaintiff the dishonor of his sister, and distrusting his declarations to the contrary. Upon hearing the confession he became satisfied, and immediately arranged with the plaintiff for the removal of the defendant from her residence, in the hotel, to his house; but, upon conversation with defendant, she herself concluded it best not to go until the following morning, it being at the time late at night. On the following morning, in pursuance of the arrangement of the previous night, she was removed to the house of her brother. From this time, all association between the parties appears to have ended.

The pretense that the confession was made through fear, does not merit consideration. That it was made, as we have stated, under great distress of mind, is true; but no retraction of it, or denial of its truth, on her removal the following day, or subsequently, appears ever to have been made. The brother, who was acting under the most painful circumstances, and was deeply affected by them, and who had previously refused to allow the removal of the defendant to his house, upon the belief that she had been the victim of the plaintiff's solicitations, accepted the confession as true, and acted upon it. The brother and mother were examined as witnesses in the cause, and not a word impeaching the truth of the confession is stated to have ever been uttered by the defendant, nor do they themselves attempt to impeach it. That it was without collusion is evident, and that it is true, hardly admits of a doubt. The conduct of the plaintiff corroborates it. Previous to the birth of the child, the parties had lived in affectionate harmony. Immediately upon this event, the plaintiff did all that a just and upright man could do to vindicate himself—to relieve himself from the burden of a dishonored wife, and her child of bastard blood. He repudiated them both—and so soon as the health of the defendant would permit, after consultation with her physician and her brother, restored her to her family. Had the parties had illicit intercourse previous to marriage, the possibility of issue must have often occurred to them, and it is highly improbable that so sudden a revulsion of feeling to his wife would have happened upon its appearance. The instinct of paternity—one of the strongest in our nature—would have strengthened rather than weakened the previous attachment to his wife upon the birth of the child.

The conduct of the defendant corroborates the confession. We have already referred to the want of any subsequent retraction or denial of its truth. The answer to the present suit, filed about six weeks subsequently, is itself an admission, and constitutes a circumstance worthy of consideration. It is under oath, and in answer to the charge in the complaint, that she was with child at the date of the marriage, by a stranger, it avers that if she was then with child she had no knowledge of it, and it was the result of an act to which she never consented, and had no knowledge of it at the time of its commission, nor until after her

marriage with the plaintiff, and that the same was committed while she was in a state of unconsciousness. There is no direct averment that the plaintiff was the father of such child, or any direct denial that it was begotten by a stranger. The controlling fact in issue is evaded in the answer, and this evasion, in a solemn judicial proceeding, is a most significant circumstance.

The conduct of the relatives of the defendant corroborates the confession. They have recognized it as justifying the repudiation and separation. These several circumstances, taken in connection with the conceded fact, that the child was begotten out of wedlock, furnish, in their collective force, sufficient corroboration of the confession to justify the conclusion that the child was the offspring of a stranger. In the cases cited by Bishop, the corroborating circumstances held sufficient, were less satisfactory than the circumstances in the case at bar.

In *Harrison* v. *Harrison*, (4 Moore, P. C. 96,) the suit was for nullity of marriage on the allegation of the husband's impotence, and in giving judgment in the Court of Privy Council for the divorce, confirmatory of the decision of the Consistory Court, and of the Court of Arches, Lord Brougham said : " It has been insisted by the counsel for the Appellant, that the confession of non-consummation is not sufficient to satisfy the one hundred and fifth canon, and that there must be some extrinsic proof, and for that purpose proof by inspection is said to be essential. Their lordships give no opinion on this construction of the canon ; for if adminicular proof is requisite, they think the circumstance of the Appellant's *having taken a legal opinion of the validity of the marriage*, which he admits in his answer, coupled with the confession of non-consummation, and the *refusal, in the first instance, to undergo inspection*, is sufficient extrinsic proof; and being satisfied that there is no collusion between the parties, they affirm the decree of nullity." " In *Noverre* v. *Noverre*, (1 Robert, 428,) the evidence, aside from the defendant wife's confession, went no further than to show extreme, but no indecent familiarities with the alleged paramour, together with ample opportunities. In *Tucker* v. *Tucker*, (11 Jur. 893,) there were no acts of familiarity proved, but there was the reception of a letter from the paramour to the wife, which she had not read and could not know the contents of, and a meeting, not at all shown to be

criminal, between her and him, after she was turned off by her husband; yet this was held amply sufficient to sustain the confessions." (Cited from a note to Sec. 310 in Bishop.)

Against the conclusion from the evidence of the confession, and the corroborating circumstances, the counsel of the Respondent urges the presumption of paternity in the plaintiff from the fact of marriage. There is no doubt that such is the presumption of the law. A child born in lawful wedlock is presumed to be the child of the husband. This has been held in numerous cases. (See *Stigall et al.* v. *Stigall,* 2 Brock, 261; *The State* v. *Herman,* 13 Ired. 502; *The King* v. *Luffe,* 8 East. 191.) The marriage is regarded as an acknowledgment by the husband that the child is his, but as in all cases of acknowledgment, to be effective, there must be knowledge at the time of the fact admitted. The case of *The King* v. *Luffe,* (8 East. 210,) cited by the Respondent, arose upon a question of bastardy, but in the opinion of Mr. Justice Lawrence, the reason of the presumption in cases of ante-nuptial pregnancy, is stated. "By the civil law," says the Justice, "if the parents married any time before the birth of the child, it was legitimate; and our law so far adopts the same rule, that if a man marry a woman who is with child, it raises a presumption that it is his own. Lord Rolle gives some such reason for the rule, and it seems to be founded in good sense; for where a man marries a woman *whom he knows to be in this situation,* he may be considered as acknowledging, by a most solemn act, that the child is his." The knowledge of the situation of the party constitutes the ground of the presumption.

In *Wright, Administrator* v. *Hicks,* (15 Ga. 160,) the doctrine of presumptive paternity in a case of ante-nuptial pregnancy was considered, and the decision of the Court bears directly upon the question before us. In that case the wife was with child at the time of the marriage, and immediately upon her pregnancy being discovered, the husband returned her to her family. In the settlement of the estate, the question of the child's right of inheritance arose. Mr. Justice Lumpkin delivered the opinion of the Court, and after referring to the able and thorough discussion had in the case, on a previous occasion, said: "The importance, as well as the novelty of the question, led us to devote to it as large a portion of our time as we could possibly spare

from other necessary avocations. We exerted our utmost diligence to collect all the information, so as to enable us to form a correct judgment, and prescribe the best possible rule that our minds were capable of arriving at. And we flatter ourselves, that we did not toil in vain. And the principles of law regulating this question, as deducible from all the authorities, English and American, were thus summed up : that is, that although the birth of a child, during wedlock, raises a presumption that such child is legitimate, yet that this presumption may be rebutted, both by direct and presumptive evidence. And that, in arriving at a conclusion upon this subject, the jury may not only take into their consideration proofs tending to show the physical impossibility of the child born in wedlock being legitimate, but they may decide the question of paternity, by attending to the relative situation of the parties—their habits of life, *the evidence of conduct, and of declarations connected with conduct.* and to *any* induction which reason suggests, for determining upon the probabilities of the case.

That where the husband and wife have had the opportunity of sexual intercourse, a very strong presumption arises, that it must have taken place, and that the child in question is the fruit; but it is only a very strong presumption, and no more. The presumption may be rebutted by evidence; and it is the duty of the jury to weigh the evidence against the presumption, and to decide, as in the exercise of their judgment, either may appear to preponderate. (*Wright* v. *Hicks*, 12 Ga. Rep. 155.)

We now re-affirm, distinctly and fully, the doctrine then laid down, as the law of this case. Indeed, it is the law, not now questioned in any respectable quarter, on this or the other side of the water, whatever doubts may have once been entertained to the contrary. It has been the law of Westminster Hall, since the decision of *Prudsell* v. *Prudsell,* (2 Strange, 925,) in 1732, by Lord Raymond.

* * * I venture to suggest another observation. While the law presumes every child legitimate which is born within wedlock, still, in questions of this sort, there is and should be a difference between past and ante-nuptial conceptions. In the latter, much slighter proof should be required to repel the presumption of legitimacy, arising from marriage. For here, it is

the marriage only, and not the presumed sexual intercourse resulting from marriage, which creates the presumption. Every child begotten and born within wedlock is rightly presumed to be the offspring of the husband. But such presumption does not necessarily arise where the child is begotten *before* marriage. Another man may as likely be the father as the future husband, as no one was entitled to sexual intercourse."

The Justice then proceeds to consider the evidence which should have been submitted to the jury, and holds that the evidence of the husband's conduct, in returning the wife to her family; his declarations on the subject; the statements of the wife upon his upbraiding her for her imposition upon him as a virgin, and of her conduct, should have been left to the jury, and cites the case of *Morris* v. *Davis*, (Sir Harris Nicholas, on Adulterine Bastardy, 216,) in which the question arose, whether the inference arising from the conduct of the parties, might be held sufficient to rebut the legal presumption springing from the marriage. "And the Court there thought," says the Justice, "that the evidence arising from the conduct of the parties, was most material and important; and suggested what is true, that in the Banbury Peerage case, the conduct of the parties, not at the time of the *conception* of the child, but at its *birth,* and for several years subsequently, and the evidence thus arising, formed a principal ground of the judgment of the House of Lords."

But admitting the full force of the presumption for which the Respondent contends, it is met and overcome by the evidence. The confession being admitted, the paterity of the child is placed upon a stranger beyond a doubt. The vice of the ingenious argument of the counsel of the Respondent arises from the assumption with which he starts, that the confession is to be entirely excluded from consideration. This being taken from the case, he argues, with much plausibility, that the circumstances established do not outweigh the force of the presumption of law. The argument falls with the assumption.

We do not attach much importance to the suggestion that the plaintiff must have discovered the situation of the defendant long previous to the birth of the child, and that his silence thereupon must be regarded as an acknowledgment of its paternity.

We cannot assume that he detected her pregnancy, and if he had reason to suspect it, that he must have done so at so early a period after marriage as to have referred it to ante-nuptial incontinence. To one, who we must believe from the evidence, possessed a strong affection for his wife, the suspicion of a want of chastity would never arise. Affection will give every excuse for appearances, except that of dishonor. As against the weight of the evidence from the confession and corroborating circumstances, the suggestion is without force.

The remaining question relates to the sufficiency of the cause assigned as a ground of divorce. Our statute provides that a divorce may be granted "when the consent of either of the parties to the marriage was obtained by force or fraud, upon the application of the injured party." (Act of April, 1853.) Marriage is considered by our law as a civil contract, to which the consent of the parties is essential, (Act concerning Marriages, Sec. 1,) and is subject to avoidance for material and substantive fraud in its procurement. Reeve, in his treatise on the domestic relations, says on this subject : "A man by the foulest fraud, gets possession of the property of his neighbor. A contract thus basely obtained is not only void, but, in many instances, the obtaining of it is a felony. The common sense of mankind must revolt at the idea that, when a man, by the same abominable fraud, has obtained the person of an amiable woman and her property, the law should protect such contract, and give it the same efficacy as if fairly procured. The truth is, that a contract which is obtained by fraud, is, in point of law, no contract. The fraud blots out of existence whatever semblance of a contract there might have been. A marriage procured without a contract, can never be deemed valid. There is no more reason for sanctioning a marriage procured by fraud than one procured by force and violence. The consent is as totally wanting, in view of the law, in the former as in the latter case. The true point of light in which this ought to be viewed, I apprehend, is, that the marriage was void, *ab initio ;* but it is necessary to have a divorce by the Court, since the marriage has been celebrated, that all concerned may be apprised that such marriage has no effect. Upon the same principle that chancery decrees contracts, unfairly obtained, void, all the apprehension that is created in

the minds of conscientious men, of the illegality of separating husband and wife, is dissipated." (Cited from Bishop on Marriage and Divorce, Sec. 104, Note 1.)

It cannot be pretended that the condition of the defendant was not a most material circumstance to the consent required for the validity of the contract. Its concealment operated as a fraud upon the plaintiff of the gravest character. His contract was with and for her; it referred to no other person, much less included a child of bastard blood. A child imposes burdens and possesses rights. It would necessarily become a charge upon the defendant, and through her upon the plaintiff. It would become presumptive heir of his estate, and entitled under our law, as against his testamentary disposition, to an interest in his property acquired after marriage, to the deprivation of any legitimate offspring. The assumption of such burdens, and the yielding of such rights, cannot be inferred in the absence of proof of actual knowledge of her condition on his part. Again, the first purpose of matrimony, by the laws of nature and society, is procreation. A woman, to be marriageable, must, at the time, be able to bear children to her husband, and a representation to this effect is implied in the very nature of the contract. A woman who has been pregnant over four months by a stranger, is not at the time in a condition to bear children to her husband, and the representation in this instance was false and fraudulent. The second purpose of matrimony is the promotion of the happiness of the parties by the society of each other, and to its existence, with a man of honor, the purity of the wife is essential. Its absence under such circumstances as necessarily to attract attention must not only tend directly to the destruction of his happiness, but to entail humiliation and degredation upon himself and family. We can conceive no torture more terrible to a right-minded and upright man than an union with a woman whose person has been defiled by a stranger, and the living witness of whose defilement he is legally compelled to recognize as his own offspring, as the bearer of his name and the heir of his estate, and that, too, with the silent, if not expressed, contempt of the community. By no principle of law or justice can any man be held to this humiliating and

degrading position, except upon clear proof that he has voluntarily and deliberately subjected himself to it.

In *Morris* v. *Morris*, (Wright's Rep. 630,) there was pregnancy and concealment, but there were no affirmative acts on the part of the wife to conceal her situation, except in the wearing a full Quaker dress at the ceremony of the marriage, which took place in the dusk of the evening, without lights. From the 4th of July to the marriage, on the 17th of October following, the husband was unremitting in his attentions to her. No representations were proved, and "the husband and wife lived together, without his suspicions being awakened, until the wife was taken in labor pains, and presented her wondering spouse a full-grown child, before the expiration of the honeymoon, after which they separated." A divorce was decreed, and the child given to the mother.

In *Ritter* v. *Ritter*, (5 Black. 84,) the defendant was pregnant by a stranger at the date of the marriage. The petitioner discovered her situation the night of the marriage, of which he had no previous knowledge or suspicion. Upon discovering the pregnancy, he abandoned her. It does not appear that the defendant herself made any efforts to conceal her situation, though it was alleged that the true father fraudulently and clandestinely assisted in effecting the marriage. The Circuit Court refused the divorce and dismissed the bill, but the Supreme Court reversed the decision, using in its opinion this language:

"However little we may feel disposed, in general, to disturb the decisions of the Circuit Courts, respecting divorces for causes not specified by the statute, we cannot contemplate the case presented by the record without coming to the conclusion that, in refusing the divorce, the Court did not exercise its discretion in a sound and legal manner, having due regard to the rights of the injured party, and the purity of public morals."

The principal case upon which the Respondent relies, is that of *Scroggins* v. *Scroggins*, (3 Dev. 535). The opinion delivered in that case contains general observations which, if admitted as law, would sustain the defense; but the special ground upon which the decision rests does not militate against the views we have expressed. The point decided is, that where the husband at the marriage knows that his intended wife is lewd, he is not

Baker *v.* Baker.

entitled to a divorce upon the subsequent birth of a child be-
gotten previously.   There was no statute in North Carolina
similar to ours, authorizing a divorce when the consent to the
marriage had been obtained by fraud.   The statute of that State
authorized a divorce only in two cases—impotency at the time
of the marriage and still continuing, and separation by one party
from the other and living in a state of adultery.   For other
cases, the Superior Courts were empowered to divorce whenever
they were satisfied of the *justice of the application.*   In the case
in question the wife gave birth to a mulatto child about five
months after the marriage, and upon that event the husband
left her.   But the Court says:

" He does not venture to swear that he believed her chaste at
the time of the marriage.   It must be taken that he did not; if
he had, it would have been the first thing thought of, to aggra-
vate his case.   Suppose that we are to presume that he means
to admit a criminal conversation between themselves—and that
is the most favorable to him—what claims has he to relief, upon
the ground of grosser incontinence, than that in which he had
participated?"   And, again:

" His disgrace is voluntarily incurred, and he has no elevation
of sentiment or feeling above it.   We think him criminally ac-
cessory to his own dishonor, in marrying a woman whom he
knew to be lewd; or, by continuing his cohabitation, after he
must have known it, up to the happening of an event by which
the world acquired the same knowledge.   He now asks to be
freed from his bonds, because the infamy of his wife has become
notorious, though he could reconcile himself, in secret, to the
crime which makes her infamous.   Such a prayer must be re-
jected, and the judgment of the Superior Court affirmed."

The Judge who delivered the opinion appears, from his general
observations, to have considered that concealment of pregnancy
was not such a fraud as would vitiate the marriage contract;
and the ground upon which he rested his conclusion was the
supposed difficulty of limiting the principle contended for.   " If
it embrace," he says, " a case of pregnancy, it will next claim
that of incontinence; it will be said the husband was well ac-
quainted with the female, and never suspected her, and has been
deceived; then, that he was a stranger to her, smitten at first

Baker *v.* Baker.

sight, and drawn, on the sudden, into a marriage with a prostitute; that he was young and inexperienced, hurried on by impetuous passion, or that he was in his dotage, and advantage taken of the lusts of his imagination, which were stronger than his understanding. From uncleanness, it may descend to the minor faults of temper, idleness, sluttishness, extravagance, coldness, or even to fortune inadequate to representations, or perhaps, expectations."

We do not perceive the difficulty which the learned Judge appears, from the passage cited, to have experienced, in limiting the application of the principle. There is a marked distinction between the ante-nuptial incontinence and the vices and faults he enumerates, and ante-nuptial pregnancy by a stranger. The former do not impose upon the husband the burden of another's child, while the latter does; they do not give him an heir by a stranger; they do not necessarily render the wife, at the time of marriage, incapable of bearing children to her husband, while the latter does; they may be concealed, and much of the humiliation attendant upon the birth of the child, and the consequent change in the relations of the parties to the community be avoided. The former are deemed insufficient for a divorce, on grave grounds of public policy, which can have no existence with reference to the latter. To use the language of the counsel of the Appellant, the line of whose argument we have mainly followed in this opinion, "no good purpose can be subserved by charging upon a man, as his own, a child of bastard blood, or by coercing a legal union between an upright man and a corrupted woman, where there can be no union, in fact, and where the mandate of the law would be a vain record, except so far as it would be an instrument of undeserved and perpetual-torture."

We are of opinion that the fraud alleged in the present case goes to the substance of the marriage contract, and vitiates it *ab initio;* and, as a consequence, that the judgment of the Court below must be reversed, and that Court directed to enter a decree annulling the marriage contract between the parties.

Ordered accordingly.