CHARLEY LYLE v. THE STATE.

*No. 7620. Decided June 25.*

**1. Intoxication—Statute Construed.—**The rule is statutory in this State that neither intoxication nor temporary insanity of mind produced by the voluntary recent use of ardent spirits will excuse crime, nor will intoxication mitigate either the degree or penalty of crime; but evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant in any criminal prosecution in mitigation of the penalty attached to the offense for which he is being tried. The rule thus fixed, as applied to offenses in general, rejects intoxication or temporary insanity produced by intoxication as excuse for crime, and admits proof only of temporary insanity so produced in mitigation of the penalty.

**2. Same.—**Notwithstanding the construction heretofore placed upon the statute by this court, it is held in this case, by the majority of the court, that the drunkenness of the defendant may be proved when the condition or status of his mind is an essential element of the offense charged—when the offense embraces deliberation, premeditation, and intent. In such cases proof of drunkenness can be made in order to determine whether the very crime defined by the law, and charged against the accused, has been in fact committed. [Overruled by Evers v. The State, post, page 320.—REPORTER.]

**3. Same—Perjury.—**Among the ingredients essential to constitute perjury the false statement assigned must have been made by the accused deliberately and willfully; his mind must have been deliberate; he must, in such mind, have made the false statement deliberately and willfully; he must have known the statement to be false. and with such knowledge he must deliberately have made it. To this extent the offense of perjury involves the condition and status of the mind of the accused, and whether intoxicated at the time he made the false statement, and incapable of mental deliberation and criminal intent, and therefore incapable of perjury, is a proper inquiry to be submitted to the jury. See in extenso the opinion of Hurt, Presiding Judge, in elaboration of the question, and for a review of authorities thereon. [Overruled by Evers v. The State, post, page 320.—REPORTER.]

**4. Same—Charge of the Court.—**When the nature of the offense charged is made by law to depend upon the peculiar condition and state of the mind of the accused at the time, it is not only proper that evidence of drunkenness as a fact affecting the mind should be received, but the court should instruct the jury that in passing upon the question whether the accused deliberately and willfully committed the act, they should look to all the evidence. including that relating to drunkenness, in connection with the other testimony tending to show the condition of the mind of the accused. [Overruled by Evers v. The State, post, page 320.—REPORTER.]

**5. Same.—**The perjury assigned in this case was the false statement of the accused to the grand jury that a game of cards was not played at a certain place and time. The proof on this trial tended strongly to show that the accused was drunk at the time and place of the card playing, and when he made the false statement to the grand jury. In this condition of the proof the accused requested the court to charge the jury as follows: " You are instructed that if you believe from the evidence that the defendant made the statements before the grand jury which are alleged to be false, still if the jury further believe from the evidence that the defendant was in such a mental state or condition, produced by the long

continued and excessive use aided by recent use of intoxicating liquors, as not to have been conscious of what he was doing, then you should find the defendant not guilty." And further: "You are instructed that if the defendant did not know said statements made by him before the grand jury were false at the time he made them, he is not guilty of perjury; and if you have a reasonable doubt that he knew said statements were false at the time he made them, you will find him not guilty." *Held*, that while the instruction was objectionable as requiring the jury to find the defendant intoxicated to that degree to deprive him of consciousness, and the capacity to deliberate and do a willful act, and to that extent more than properly favorable to the State, it was sufficient to direct the attention of the court to the correct rule of law applicable; wherefore the trial court erred in not giving to the jury a proper and correct charge upon the question.

6. **Same.**—Under the evidence showing that the accused was drunk at the time and place the cards were played, the trial court erred in failing to charge the jury, in substance, that in connection with other evidence in the case such proof should be considered in determining whether the accused knew the game was played, or whether at the time he made the statement he remembered having seen the game played, if indeed he did see it. [See Evers v. The State, post, page 320.—REPORTER.]

7. **Same—Case Reviewed—Concurring Opinion.**—See the opinion of Hurt, Presiding Judge, for a review of Evers' case, 29 Texas Court of Appeals, 539, and the opinion of Simkins, Judge, concurring in the disposition of this appeal, but not in the reasoning upon which it is based.

APPEAL from the District Court of Mitchell. Tried below before Hon. WM. KENNEDY.

The conviction in this case was for perjury, and the penalty assessed against the appellant by the verdict was a term of five years in the penitentiary.

The perjury assigned in the indictment was the false statement of the accused, under oath, and as a witness before the grand jury of Mitchell County, Texas, that no game of cards, commonly known as the game of poker, was played in a room in the rear of the Senate saloon, in the town of Colorado, Mitchell County, Texas, on or about the 2d day of May, 1891, by John Murchison, Tom Morrison, John Morrison, C. C. Brown, and W. F. Veronce, and that he, the accused, did not, during said game, furnish or sell to the said parties poker checks or chips.

The State first introduced the minutes of the District Court of Mitchell County for the April Term, 1891, showing the organization of the grand jury for that term, and the appointment of W. T. Scott as foreman thereof. This was the grand jury before which the perjury was alleged to have been committed.

Stated in brief, the testimony of W. T. Scott was to the effect, that on the Monday succeeding Saturday, May 2, 1891, the defendant, in obedience to a subpœna issued by the witness, appeared before the grand jury of Mitchell County, Texas, and was examined, or interrogated, as to his knowledge of violations of the gaming laws, and especially as to a game

of cards said to have been played on the preceding Saturday night, May 2, 1891, in the rear room of the establishment in Colorado known as the Senate saloon.  In reply to such interrogation, the defendant, who had taken the prescribed oath, declared that no game of cards was played in that room on that night; that he had charge of that room on that night, and also of the chips or checks used in gaming, and that he knew no game of cards was played in that room on that night; that he frequently passed through that room between the hours of 8 and 12, and that he would have seen any game being then played, but saw none.  His attention being expressly called to the current rumor that in a game of poker in that room on that night, with John Morrison, John Murchison, and others, one Veronce, a blacksmith, of the town of Midland, lost his watch, the defendant repeated his declaration that no game of cards was played in the room referred to on the night referred to.  Defendant was not drunk, nor affected by drink, so far as the witness could tell, while testifying, nor did he say anything about being drunk on the Saturday night of the alleged card playing.  He may have had a few drinks, but the witness was satisfied he knew well what he was doing and saying.  Witness had known defendant for many years, during which period he had always maintained a good reputation for truth and veracity.  The room mentioned in the indictment was a rear attachment of the Senate drinking saloon, a public place owned by Bill and Asa Grant, and used for the sale of spirituous liquors.  This witness was corroborated in extenso and in detail by other members of the grand jury, and by the county attorney, who had interrogated the defendant when before the grand jury.

W. F. Veronce was the next witness for the State.  He testified, in substance, that he resided in the town of Midland, Texas, and lived there in May, 1891.  He was in the town of Colorado, Mitchell County, on the night of Saturday, May 2, 1891.  About dark on that night, in company with C. C. Brown, the witness went into the back room of the Senate saloon, in said town, passing through the said saloon.  Witness and Brown went into that room to engage in a game of poker..  The room, at the time witness and Brown entered it, was occupied by Tom and John Morrison and another person, who were playing poker at the table.  Witness and Brown joined that game.  The defendant was present in the room during the playing of that game, sat in a chair near the table to the left of the witness, and sold the chips used in the playing of the game.  He did not take part in the playing of the game further than to examine the several hands and determine which of them required the placing of chips in the "hole," or, as it is known to poker players, the "take off," representing the game fees going to the person running the game.  The defendant was running the game on that Saturday night; that is, he was performing the acts usually performed by the person running a poker game.  During that game the witness got $20 from Tom Morrison on his watch.  Half of that amount

the witness at once gave to defendant for chips, and got from him $10 worth of chips in return.   The witness was considerably under the influence of liquor at the time, but was sober enough to realize and know the facts to which he has testified.   He was not certain that he got any other chips from the defendant than those mentioned, but he thought that he did.   He was not certain that other players in the game got chips from defendant during the game, but it was his recollection that they did.   Witness did not know who cashed the chips at the close of the game.   He knew that he had no chips to be cashed, and so paid little or no attention to that ordinarily most important feature of the game.   If the defendant was drunk, or drinking to any excess on that Saturday night, the witness did not observe it.   Dave Thomas and F. E. Kelly were in the room during the playing of the game.   The room in which the game was played was the rear room of the Senate saloon, and was reached by going through the saloon.

Dave Thomas testified, for the State, in substance, that he was in the rear room of the Senate saloon in Colorado, Texas, between 9 and 10 o'clock on the night of Saturday, May 2, 1891.   At that time a game of poker was being played in that room.   W. F. Veronce, the witness who last testified, was one of the parties playing in the game.   Defendant was in the room at the time, and the witness once observed him place some chips in the " hole."   He, defendant, once at least sold or furnished some poker chips to Veronce.   He got these chips from a drawer in the chip rack, which he opened with a key he took from his pocket.   Veronce was considerably under the influence of whisky, but if the defendant was in any degree intoxicated witness did not observe it.

The substance of the testimony of F. E. Kelly was, that he was in the room referred to in the indictment between 8 and 9 o'clock on the night of Saturday, May 2, 1891.   A game of poker was then being played by Veronce and others in that room.   The defendant was present, but was not a player in the game.   If he was drinking, the witness, to whom defendant was a stranger, did not know it.

W. F. Robinson testified, for the State, that he and one Fox went into the Senate saloon about midnight on the night in question.   They passed into the poker room, the bar tender closing the connecting door behind them.   As they went into the said room they met the defendant going out.   He collided with witness as he passed out, leaving upon witness the impression that he was drinking.   Defendant was a constant drinker. It was, the witness thought, a difficult thing for a person not well acquainted with defendant to tell when he was drinking.   He had been drinking constantly and hard for some time previous to the night referred to in the indictment.   The room described in the indictment was a gaming room, and was run under the management of the defendant.   A game, as described by previous witnesses, was played in that room on the night in

question, and it was fair to assume that, being in that room, defendant saw it. Defendant's reputation for truth and veracity had always been good.

John Murchison was the next witness for the State. He testified to facts which showed the presence of the defendant in the room mentioned in the indictment during the progress of the game of poker.

His further testimony was to the effect, that he observed on that night that the defendant was drinking, and that he did not pay his usual attention to the game, with reference particularly to the "take off," in which, in all games of poker, as proprietor, he was interested. In the opinion of the witness the defendant was drinking on that night to an extent that he would not remember what took place in that room, and was to some extent, at least, rendered unconscious by drink. The defendant was a man who drank a very great deal, and who, in liquor, was ordinarily a very quiet man. When in liquor his memory of things occurring during that period is bad. He had, for some time before the game referred to, been drinking heavily. As an instance of his memory as to matters occurring during his periods of drunkenness, witness could recall that about a month before this trial he saw the defendant and Tom Morrison and Jim Fisk in a game of poker. In that game defendant and Tom Morrison split jack-pots, or stood in together. At a particular juncture in that game the defendant left the room for a few minutes. When he returned he found that Fisk had won, and at once claimed to be standing in with Fisk, seemingly forgetting that it was Morrison with whom he was standing in. On the Monday morning following the game of poker denounced in the indictment the witness was in the Senate saloon. While in there he heard a heavy fall in the poker room, and on going into that room he found the defendant lying on the floor, thoroughly drunk—so drunk that having fallen heavily from a chair, the fall did not wake him. The process of taking him up and placing him on the table did not wake him. He had been drinking heavily on that day.

Tom Morrison was the next witness for the State. His testimony was corroborative of that of the preceding witness, except that this witness, while observing that the defendant was in liquor during the game of poker, did not think him so drunk as not to see, realize, and know what was going on in the room at the time referred to in the indictment.

After eliciting additional testimony going to establish the character of the room as a room commonly used for gaming, the State closed.

William Grant was the first witness for the defense. He testified, in substance, that he and his brother, Asa Grant, were the proprietors of the Senate saloon. The room which adjoins the said saloon in the rear, and known as the iron room, was a gambling room, run under the management of the defendant. With that room the witness had nothing whatever to do, nor did his brother and partner. It was not included in the

lease which covered the Senate saloon building. The witness was not at his saloon on the night alleged in the indictment after 8 o'clock, and knows nothing of any alleged card playing on that night. He knew that the defendant was drinking on the day of that night, and for some time previously had been drinking very heavily. When on his sprees the defendant frequently gets very drunk, and rarely, if ever, can recall after sobering up a thing that occurred during the time he was drunk. His memory as to what occurred during the period of intoxication is very poor. The witness saw the defendant about noon on the Monday following the Saturday night mentioned in the indictment. He was then drinking heavily and was drunk, and witness advised him to go to bed because he was drunk. The defendant then told the witness either that he had just been before the grand jury or had just been summoned to go before the grand jury. Defendant, when drunk or drinking heavily, was a very quiet man, and ordinarily on such occasions had but little to say. The witness could say conscientiously that if he did not know the defendant well he would not be apt to observe his intoxication, even when he was drunk. Defendant's reputation for truth and veracity had always been good.

William Barnett testified, for the defense, that he was bartender at the St. James saloon in Colorado. Defendant and two others came into the said saloon between 10 and 11 o'clock on the night of May 2, 1891—the night alleged in the indictment. Witness observed that the defendant was drunk. He knew nothing about the defendant's peculiarities while drunk, and could not speak of his recollection of incidents occurring during those periods. But on that night, having had three drinks—one each for himself and companions—the defendant gave the witness a $5 bill in payment, and immediately left the bar, and it was not until after witness had called him repeatedly that he came back for his change.

The remaining testimony for the defense, touching the intoxication, and the mental condition of the defendant at the time the game was played and when he testified before the grand jury, has been succinctly summarized in the appellant's brief, as follows:

The defendant himself testified, in substance, that he had been drinking heavily for six months. That he hardly knew when he had been sober during that time. That he had absolutely no recollection of the game of cards in question, nor of making any statements about the same before the grand jury. That he simply had a faint recollection of being before the grand jury. Didn't know what he said. "It all seems to me like a dream," etc.

Jack Rogers, witness, testified, that he had known defendant seven or eight years. Don't think he remembers anything that takes place when drunk. He is very quiet when drunk, and one not well acquainted with his manners might not notice or know when he is drunk. He only an-

swers questions when in this condition. Don't talk any. Witness gave instances of his unsound memory. Stated that he had known of his being at places and not know afterwards how he got there, or where he was.

Jake Maurer testified, that defendant had been drinking very heavily for several months. Don't think he knows anything that takes place while he is drinking heavily or drunk. Witness gave an instance of his unsound memory. Paid his board at witness' restaurant one day, and in a few hours he came around and wanted to pay again. He is very quiet when drunk—one is apt to not notice it.

Tom Powers testified, that defendant had been drinking very heavily for several months, and very drunk at times. "Don't think he knows anything that takes place while he is drunk." Witness gave an instance of defendant depositing with him $90 and knowing nothing whatever about it afterwards. "He is very quiet when drunk, only answers questions. One is apt to not notice that he is drunk."

Frank Cooksey said he had known defendant eight or ten years. "His memory is very bad when drinking. Don't think he knows anything that takes place." Witness gave instance of defendant and himself waiting for train a long time to leave Colorado one night; train was so late they abandoned the idea. Defendant afterwards knew nothing about having been at depot waiting for train. This was just a few nights before he is charged to have committed the offense of perjury. Witness gave other instances evidencing unsound mind and memory.

John Morrison testified, that defendant was drinking heavily both on the day that the card playing took place, and also on the day he was before the grand jury, to-wit, on the 2d and 4th days of May. Witness took several drinks with defendant both days. "Don't think defendant knows anything about what takes place when he is drunk." Witness gave instances of his unsound memory. Defendant had been drinking very heavily for months.

Gus Bertner testified, that defendant had been drinking very heavily for several months. "Has no recollection of things that take place when he is drunk." Witness gave instances. Witness saw defendant both on the day the card playing took place and on the day he testified before the grand jury. He was drinking heavily and "full of whisky" on both dates.

John Manning testified, that defendant boarded at his hotel, and had been drinking heavily for several months. "On the 2nd day of May (the day the card playing mentioned in indictment took place) I played dominoes with defendant several hours. He took a drink at end of each game. The next day he remembered nothing about having played dominoes with me, except the first game, and denied having played several games with me. This was Saturday. The next Monday, the day he was

summoned before the grand jury, he was also under the influence of liquor. I took a drink with him that morning."

Ned Woods said: "I tend bar at St. James saloon. Defendant took a drink at my bar Saturday night, May 2, 1891 (night of card playing). He was then drinking heavily, and I tried to get him to go to bed."

William Barnett testified that defendant took a drink at his bar said Saturday night, May 2, 1891, and threw down a $5 bill to pay for drinks, and left without his change. "Had to call him twice to return and get his change. He appeared to be drunk."

William Grant testified, that he and his brother ran the Senate saloon. Said defendant had drunk large quantities of whisky for several months. Sometimes a quart a day. Witness gave instances of unsound memory of defendant when drunk. Said that on the day defendant was before the grand jury, and just before or just after he was before the grand jury, he saw defendant, and he was drinking heavily, and witness tried to get defendant to go to bed, because witness thought defendant was drunk. One not acquainted with defendant can hardly tell when he is drunk, he is so quiet; only answers questions. "Defendant does not remember things that take place when he is drunk. Defendant was drinking Saturday, May 2, but I was not at the saloon after 8 o'clock that night."

*Smallwood & Smith* and *Ball & Burney*, for appellant.—The court erred in refusing to give the special instruction asked by defendant, as follows: "You are instructed, that if you believe from the evidence that the defendant made the statements before the grand jury which are alleged to be false, still if the jury further believe from the evidence that the defendant was in such a mental state or condition, produced by the long continued and excessive use, aided by recent use, of intoxicating liquors, as not to have been conscious of what he was doing, then you should find the defendant not guilty." And if the said special charge was not in form or substance satisfactory to the court, then the court (his attention being thus called to the subject) should have given a charge of his own, fairly presenting the defense, that if the defendant was totally unconscious or unsound in mental condition, produced by drunkenness, either at the time said card playing took place, or at the time he was before the grand jury, he should have been acquitted, for the reason that such instruction was not contained in the main charge of the court, and because the same was applicable to and demanded by the facts of the case, and because drunkenness, excessive, long continued, and recent, and an unsound and unconscious condition of defendant's mind, produced thereby, was the principal defense in the case, and the main charge ignored this theory of the defense. Code Crim. Proc., arts. 677, 678; Willson's Crim. Stats., sec. 2338, and authorities cited; Wenz v. The State, 1 Texas Ct. App., 36; Erwin v. The State, 10 Texas Ct. App., 700; Jack-

son v. The State, 15 Texas Ct. App., 87; Niland v. The State, 19 Texas Ct. App., 166; 1 Bishop's Crim. Law, secs. 408–414.

If it be shown that a defendant in a perjury case was unconscious from drunkenness at the time certain things took place in his presence, and his mental faculties so stupefied from liquor as that such occurrences made no impression on his mind, so that he afterwards remembers nothing whatever about such occurrences, then he can never be guilty of perjury with reference to said occurrences, no matter what he swears about the same, because he can not know what is false and what is true about such things, and therefore his testimony can not be knowingly false; and this is true, even though he be sober when he so testifies; certainly so, if he be also drunk when he testifies.    Gibson v. The State, 15 S. W. Rep., 118; Bish. Crim. Law, secs. 320, 1048.

The crime of perjury requires not only that a witness shall speak false or untrue words under oath, but the witness must have in his mind at the time the specific intention to testify falsely.    In all offenses requiring a "specific intent," and a mind conscious and capable of specific knowledge at the time, drunkenness to a degree that the offender does not know what he is doing, or what has occurred previously, is a complete defense, even though such drunkenness has resulted from recent use of intoxicating liquors, to say nothing of an unsound and unconscious condition of the mind and memory resulting from the long continued and excessive use of liquor.    Reagan v. The State, 28 Texas Ct. App., 227; Bish. Crim. Law, sec. 1048.

*R. H. Harrison*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—This is a conviction for perjury.    Appellant, in obedience to subpœna, went before the grand jury of Mitchell County and was there interrogated in regard to gaming at a certain place. He swore that there had not been any gaming at said place on the preceding Saturday night, when in fact there had been a game of "poker" played at said place on that night, and in his presence.    His testimony before the grand jury was assigned for perjury, and for this the conviction was had.    Upon the trial there was evidence tending strongly to prove that appellant was drunk when the cards were played, and also when he was before the grand jury.    The court gave no instructions to the jury upon the question of drunkenness, and counsel for appellant requested the following charge:    "You are instructed, that if you believe from the evidence that the defendant made the statements before the grand jury which are alleged to be false, still if the jury believe from the evidence that the defendant was in such a mental state or condition, produced by the long-continued and excessive use, aided by recent use, of intoxicating liquor, as not to have been conscious of what he was doing, then you should find

the defendant not guilty." "You are instructed, that if the defendant did not know said statements made by him before the grand jury were false at the time he made them, he is not guilty of perjury, and if you have a reasonable doubt that he knew said statements were false at the time he made them, you will find him not guilty." The instructions were refused. In regard to the subject of drunkenness, in relation to this case, two phases are presented: (1) Will the statutes of this State prevent the jury from looking to the fact that appellant was drunk when he swore falsely before the grand jury? (2) Can the fact that appellant was drunk when the game of cards was played in his presence be considered by the jury for any purpose?

We are not to be understood as holding that appellant was in fact drunk at either of the times referred to. If there is evidence reasonably tending to prove that he was, the court should or should not have submitted this matter to the jury, this depending upon the construction to be placed upon the statute. If permitted by the statute, then the attention of the jury should have been directed to the mental condition of appellant by proper instructions. If this is not permitted, the court below did right in failing and refusing to mention the matter at all in the charge. What then is the statute? It reads: "Neither intoxication nor temporary insanity of the mind produced by the voluntary recent use of ardent spirits shall constitute any excuse, in this State, for the commission of crime, nor shall intoxication mitigate either the degree or penalty of crime; but evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant in any criminal prosecution in mitigation of the penalty attached to the offense for which he is being tried, and in case of murder, for the purpose of determining the degree of murder for which the defendant may be found guilty." Penal Code, art. 40a; Willson's Crim. Stats., sec. 92. This statute has been so construed as to exclude drunkenness in all cases, in all offenses, unless the drunkenness extends to temporary insanity, so construed that temporary insanity thus produced can be used only for the purpose of mitigating the penalty, except in the crime of murder. Ex Parte Evers, 29 Texas Ct. App., 539. At common law temporary insanity produced by the voluntary use of ardent spirits would neither excuse, reduce, nor mitigate crime. Insanity thus produced must be permanent to be excuse for crime. With other ingredients, perjury is a false statement, either written or verbal, deliberately and willfully made. In this crime there is an essential element, viz., the mental status. The mind must be deliberate, and the false statement must be intentionally, willfully made. The accused must know the statement to be false, and with this knowledge he must deliberately make it. Now, then, suppose the accused was temporarily insane from the voluntary use of ardent spirits, could he willfully and deliberately make a statement, either false or true? If he was permanently insane, could he

make, willfully and deliberately, any statement? If the insanity be temporary, is he not insane for the time being, and therefore incapable of deliberation? What is the difference between temporary and permanent insanity, as affecting the capacity for deliberation? Who will affirm that an insane man can willfully and deliberately commit an act or make a statement, being at the time insane?

The opinion in the Evers case excludes this insanity as a defense to the charge of perjury, unless for the purpose of mitigating the penalty. Under that opinion, such insanity can not be considered or relied upon to disprove the allegation in the indictment, that the defendant " did willfully and deliberately" make the statement. We had thought that the burden was upon the State to prove that the statement was willfully and deliberately made, and that any disturbing cause, whether insanity, intoxication, or anything else, might be taken into consideration by the jury when passing upon the condition of the mind. For what purpose? To solve the question whether the statement was willfully and deliberately made.

But we are told, " Ita lex scripta est." Let us see if the law is so written. Drunkenness shall not excuse or mitigate crime. This is law and common sense. But the excuse or mitigation is not needed until crime has been shown, and, when this is done, there should not be either in law or reason any excuse for crime. At common law, it was no excuse, mitigation, or reduction. The common law was right; and our statute, in permitting even temporary insanity, preceded by the voluntary use of ardent spirits, to reduce the penalty for crime, is a departure from the correct principle. Why? Because, if indeed the defendant committed the crime for which he stands convicted, there should in law and reason be no excuse for his crime or reduction of the penalty. To make the application to the particular case, if appellant willfully and deliberately made a false statement before the grand jury, as charged in the indictment, though insane from the use of ardent spirits, or from any other cause, there should be no excuse, and he should be punished, whether the insanity was temporary or permanent. But is it probable or possible that an insane man, whether his insanity be temporary or permanent, could willfully and deliberately make a statement? Will it be affirmed that a person whose reason is dethroned—who is insane—could deliberate at all, or could rationally do anything? Evidently, no person would assert such a proposition. But we are told in the Evers case that he should be punished—that he would be guilty of perjury. If this be so, then, without any sort of question, the crime of perjury would be deprived of essential elements, and the crime should be defined, thus: " Perjury is a false statement, either in writing or verbal, made under the sanction of an oath," etc. To restate: If temporary insanity, produced by the use of

ardent spirits, renders it morally impossible for the person so affected to deliberately and willfully make a statement, and if such a condition of the mind can not be looked to in passing upon the fact that the statement was so made, then we say that deliberation and willfulness are eliminated from the definition of perjury, or temporary insanity or drunkenness has been substituted for these elements that are otherwise essential.

The simple question is, can a person be guilty of perjury in this State unless he willfully and deliberately makes a false statement? If he be sane, he can not; but if insane from the use of ardent spirits, he can—if the opinion in the Evers case be correct. It is insisted, however, that the law is so written, and that we must be governed by the statute, and that the statute says that neither drunkenness nor temporary insanity produced by the voluntary use of ardent spirits shall excuse crime. So says the statute, and so we say, and so was the law in every enlightened jurisprudence long before our statute. For we have seen that, at common law, neither intoxication nor temporary insanity produced by the voluntary use of ardent spirits was permitted to excuse crime, to mitigate crime, or to reduce the penalty attached to a crime. Our statute is more liberal to the accused than the common law. It permits temporary insanity to reduce the penalty. This was not so at common law. At common law permanent insanity produced by the use of ardent spirits was not an excuse for crime, but was a complete defense establishing that there was no crime, though some of the old books call it an excuse. At common law, and in every State in the Union, neither drunkenness nor temporary insanity from the use of intoxicants was permitted to excuse crime. This was the law in every State, so far as my research extends, and this was the law in Texas when the last act was passed, as firmly fixed in the criminal jurisprudence of the American States as if inserted in their statutes, and whenever the subject of drunkenness, etc., is involved in a criminal case, and it is relied upon as a defense, the decisions state the rule. The text books and reports discuss the subject, and invariably the rule will be found fully stated, and as strongly stated against the accused as it is done in our statute.

What say the books on this subject? Before consulting the authorities, we desire to state that the evidence in this case fails to show temporary insanity, but tends strongly to show that appellant was drunk when the game was played and when he was before the grand jury. So that the authorities cited will be confined to drunkenness, leaving out the question of insanity. When can drunkenness be used by the accused upon trial for an offense? In what character of offense and for what purpose can the fact that he was drunk at the time of the supposed commission of the crime be used by the accused?

1. As to the character of the offense, it is when the condition or status of the mind is an essential element of the offense. Colbath v. The State,

4 Texas Ct. App., 76; Brown v. The State, Id., 275; McCarty v. The State, Id., 461; Payne v. The State, 5 Texas Ct. App., 35; Golliher v. Commonwealth, 2 Duv., 163; The People v. Odell, 1 Dak., 197; 46 N. W. Rep., 601; Cartwright v. The State, 8 Lea, 376; McIntyre v. The People, 38 Ill., 514; Roberts v. The People, 19 Mich., 401; The People v. Harris, 29 Cal., 678; The People v. Eastwood, 14 N. Y., 562; The People v. Walker, 38 Mich., 156; and Lancaster v. The State, 2 Lea, 575. Where the offense charged embraces deliberation, premeditation, intent, and the like, evidence of intoxication may be important. The People v. Harris, 29 Cal., 678; The State v. Johnson, 40 Conn., 136; The State v. Welch, 21 Minn., 22; The People v. Robertson, 2 Parker, Crim. Rep., 235; Pigman v. The State, 14 Ohio, 555; Hopt v. The People, 104 U. S. 631, and hundreds of other cases. We desire to call especial attention to Hopt v. The People, 104 United States, 631, and to Haile v. The State, 11 Humphrey, 154. In the Hopt case, the Supreme Court of the United States, after having stated the common law rule, to-wit, " At common law, indeed, as a general rule, voluntary intoxication affords no excuse, justification, or extenuation of crime committed under its influence," say: " But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act." In Lancaster v. The State, supra, it is held, upon a trial for murder in the first degree, or an assault to commit murder in the first degree, drunkenness to any extent is relevant, though it may not be so excessive as to render the accused incapable of deliberating, because it may have excited him, and produced a state of mind unfavorable to premeditation and deliberation. In Haile's case, supra, the same proposition is stated, and the opinion delivered in that case is the ablest one we have examined upon the subject. It was written by that great jurist, Nathan Green, whose opinions are authority not only in America, but are cited with approval by the highest courts of England. We cite from the opinion in the Haile case the following: " When the question is, whether a party is guilty of murder in the first degree, it becomes indispensable that the jury should form an opinion as to the actual state of the mind with which the act was done." This is so in perjury. " All murder in the first degree (except," etc.) " must be perpetrated willfully, deliberately, and maliciously, and premeditatedly," and so perjury must be committed willfully and deliberately. " The jury must ascertain, as a matter of fact, that accused was in this state of mind when the act was done." And so, in perjury, the jury must ascertain that the statement was willfully and deliberately made. " Any fact, therefore, which will shed light upon this subject may be looked to by them, and may constitute legitimate proof for their consideration. And,

among other facts, any state of drunkenness, being proved, is a legitimate subject of inquiry as to what influence such intoxication might have had upon the mind of the offender in the perpetration of the deed." "We know that an intoxicated man will often, upon a slight provocation, have his passions excited, and rashly perpetrate a criminal act. Now it is unphilosophical for us to assume that such a man would, in the given case, be chargeable with the same degree of deliberation and premeditation that we would ascribe to a sober man, perpetrating the act upon a like provocation." "The question in such case is, what is the mental status? Is it one of self-possession, favorable to fixed purpose, by deliberation and premeditation, or did the act spring from existing passion, excited by inadequate provocation, acting it may be on a peculiar temperament, or upon one already excited by ardent spirits? In such case it matters not that the provocation was inadequate, or the spirits voluntarily drunk; the question is, did the act proceed from sudden passion, or from deliberation or premeditation? What was the mental status at the time of the act, and with reference to the act? To regard the fact of intoxication as meriting consideration, in such a case, is not to hold that drunkenness will excuse, but to inquire whether the very crime which the law defines and punishes has been in point of fact committed."

We can add nothing to this reasoning. It is absolutely unanswerable. We call attention to the opinion in this case, also, for the purpose of showing the character of crimes in which the jury should look to the fact that the accused was drunk, and crimes in which they should not.

We come now to the second question, viz.: For what purpose can drunkenness be proved and considered on the trial of cases in which the question is relevant? We answer by an excerpt from the opinion of Judge Reese in the case of Swan v. The State, 4 Humphrey, 136, to-wit: "To inquire and ascertain whether the very crime which the law defines and punishes has been in fact committed." If in point of fact the very crime which the law defines and punishes has been committed, drunkenness and other disturbing cause will not and should not excuse the criminal. We have seen that at common law, and in all the States, with or without statutes, the rule is absolutely fixed that drunkenness will not excuse crime; that temporary insanity produced by the use of ardent spirits will not excuse crime; and we find that in all the cases upon the subject this rule is stated with approval. Yet we find that the rule is so construed as to permit the jury to look to the fact that the accused was drunk, though not temporarily insane, nor extending to that condition as would deprive the accused of the capacity to willfully and deliberately commit the act. We know of but one State in which the contrary is held—Missouri. In New York the opinions are in conflict.

But we are told in the Evers case that no other construction can be

placed upon our statute than that contained in that case. Let us examine this proposition. Our statute simply declares the common law, with this exception: at common law temporary insanity, produced by the voluntary use of ardent spirits, was not permitted to reduce the penalty; under our statute it may. This is the only difference, and the change in the statute is not against, but favorable to, the accused. How, then, can the change alter the construction which has been placed upon the common law rule by almost all the courts? At common law, neither voluntary drunkenness nor temporary insanity produced thereby would excuse crime. This is so under our statute. They are precisely the same to this extent. What construction has been placed upon the rule at common law? This we have seen from the cases cited. What construction should be placed upon our statute? What is the rule? The statute, being in affirmance of the common law, is to be construed as was the rule at common law. This is the received doctrine in such cases. Baker v. Baker, 13 Cal., 87; Miles v. Williams, 1 P. Wms., 252; Arthur v. Bokenham, 11 Mod., 150; Suth. St. Const., 291. The last author says: "A statute in affirmance of a rule of the common law will be construed as to its consequences in accordance with such law."

A few remarks with reference to the effect of the construction of the statute contained in the Evers case. In effect, the rule there asserted, is that neither temporary insanity produced by the voluntary use of ardent spirits, nor voluntary drunkenness, can be used for the purpose of determining the condition of the mind in any offense, except in case of murder. What a startling proposition. In this case the charge is perjury. To constitute this offense the accused must willfully and deliberately, without any agitation, make a false statement. These elements are made essential to the crime, and without either there is no crime. It is held in the Evers case, that a person can, while temporarily insane, deliberately, willfully, and calmly make a false statement, or that the insanity takes the place of these elements; that, though drunk, he can so make a false statement. This last may be true, but being a question of fact, drunkenness may be considered by the jury so as to determine whether in fact the statement was so made. We know that if the person was insane he could not calmly and deliberately make a statement, and we also know that drunkenness is a condition very unfavorable to a calm, willful, and deliberate act. But the opinion excludes both as defenses, and the consequence of the rule is, that in every crime in which the state of the mind is an essential element the law eliminates this element from the crime and substitutes temporary insanity, produced by the use of ardent spirits or voluntary drunkenness. Is it a fact that in every offense in which the state of the mind is by law made an essential element the statute has taken from such offense this element? There are many of such offenses, and if the opinion in the Evers case be correct, what a far-reaching statute.

Let us now apply the rule announced in the Evers case:     A. is on trial for perjury.     The evidence makes it absolutely certain that, at the time the accused made the statement, he was temporarily insane from drink. The court charges the jury that they must believe that the statement was calmly, willfully, and deliberately made.     What a farce, and what a travesty on common sense.     Why not charge the law as announced in the Evers case, to-wit:     "If you believe that when defendant swore falsely he was temporarily insane from voluntary use of ardent spirits, you will find him guilty?"     Again, the evidence shows that defendant was drunk, but not insane, and in that case the court should instruct them that, to convict, they must believe that defendant, without agitation, willfully and deliberately made the statement, and in passing upon that fact they must not look to the fact that he was drunk.     By the way, evidence of drunkenness, unless it produces temporary insanity, under the Evers case, should be rejected, for temporary insanity, so produced, except in case of murder, when the contest is between express and implied malice, can be urged for no other purpose than to reduce the penalty.     We have nothing to add upon this branch of the case.

What should be the rule?     When the nature of a crime is made to depend by law upon the peculiar state and condition of the mind of the accused, at the time, and with reference to the act done, drunkenness, as a matter of fact, affecting some state of the mind, is a proper subject for the consideration of the jury, the inquiry in such a case being, what is the mental status?     And in all cases in which the status of the mind is an essential element in the crime, the court should not only admit evidence of drunkenness, but instruct the jury that they should (in a case like the present), in passing upon whether defendant, without agitation, willfully and deliberately made the false statement, look to all the evidence, including that relating to drunkenness, in connection with the other testimony tending to show the condition of the mind of the accused.     This we held to be the duty of the trial court in Reagan's case, 28 Texas Appeals, 227.

Counsel for appellant asked a charge upon the subject, which was refused.     The charge was more favorable to the State than the law requires. It required the jury to believe that the intoxication had deprived defendant of consciousness of what he was doing.     This assumed the rule to be, that the degree of drunkenness must be such as to deprive defendant of the capacity to deliberate—to do an act willfully and deliberately.     This is not the rule.     Read the unanswerable argument of the jurist Nathan Green, in the Haile case.     The requested charge served to call the attention of the court to the subject, and a proper charge should have been given.     There is evidence tending to prove that, when the game was played, defendant was present, but drunk.     The court should have instructed the jury that they might consider this evidence, with all other

testimony in the case, for the purpose of determining whether the defendant knew that the game was played, or whether at the time he made the statement he remembered having seen the game played, if in fact he did see it.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

SIMKINS, JUDGE.—It is with hesitancy I concur in the conclusion of the presiding judge, reversing this cause. But I do not concur in all the reasons given in the opinion. The principal, if not the only, defense was the condition of defendant's mind at the time he made the statement before the grand jury, upon which the charge of perjury was predicated. Defendant denied that he was in such a condition as to have been capable of committing perjury. The charge of the court upon the mental status seems to limit the right of defense only to statements made under mere agitation, inadvertence, or mistake. This defense was not set up or relied upon in the case. The charge was too restrictive, and, in effect, instructed the jury to disregard the defense which the court had admitted as competent evidence. I think the charge asked by defendant should have been given.

Davidson, J., dissents.